IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HOWARD B. HOFFMAN                 :
                                  :
v.                                :   Civil No. WMN-04-3072
                                  :
BALTIMORE POLICE DEPT. <u>et al.</u>   :


**MEMORANDUM**

Before the Court is Defendants' Motion To Dismiss.  Paper No. 13.  Also pending is Defendants' Motion To Seal the Entire Record.  Paper No. 14.[1]  Both motions are fully briefed.  Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that the motion to dismiss will be granted in part and denied in part, and the motion to seal will be denied in its entirety.

**I. FACTUAL BACKGROUND**

Plaintiff was employed briefly by the Baltimore City Police Department [BPD] as an attorney concentrating in employment law.  He alleges that while so employed he was discriminated against, and eventually terminated, on the basis of his race (Caucasian).  Although embellished somewhat in

_____

[1] Plaintiff has filed a motion seeking to seal a single document.  Paper No. 20.  Because Defendants believe that the entire record should be sealed, they obviously do not oppose this motion.

Plaintiff's opposition to the motion to dismiss, the allegations in Plaintiff's Amended Complaint (upon which the decision of the Court on a motion to dismiss must be based) are as follows.

Plaintiff was interviewed for his position by BPD's Chief of Legal Affairs, Sean Malone, and Chief of Human Resources, Daniel O'Conner.  Malone and O'Conner, both Caucasian males, recommended that Plaintiff be employed and he began work in February 2002.  Shortly after Plaintiff's employment, Malone left the position of Chief of Legal Affairs and was replaced by Defendant Sheila Anderson, who is African-American.  At all times relevant to this action, Defendant Thurman Zollicoffer served as the City Solicitor,[2] Defendant Donald Huskey as Deputy City Solicitor, and Defendant Joan Thompson as Director of BPD's Equal Employment Opportunity Unit, the unit within BPD that investigates complaints of employment discrimination [the EEO Unit].  While Plaintiff did not name her as a defendant in this action, he alleges that Deborah St. Lawrence, another attorney in the City Law Department, joined in his harassment.  Zollicoffer, Huskey, Thompson, and St.

---

[2] Subsequent to Plaintiff's employment with the BPD, Defendant Ralph Tyler assumed Zollicoffer's position as City Solicitor.  Defendant Tyler is not alleged to have been involved in any of the decisions related to Plaintiff and is named in this suit in his official capacity only.

Lawrence are all African-American.

The harassment of Plaintiff is alleged to have taken a number of forms.  Plaintiff asserts that Defendants forced him to physically relocate his office numerous times without justification, subjected him to intense scrutiny, assigned him a disproportionately heavy case load, and encouraged others to file false or exaggerated complaints about him.  Plaintiff avers that African-American hires were not similarly treated.

According to the allegations in the Amended Complaint, Plaintiff's termination was the direct result of his criticism of the EEO Unit.  In the course of defending a discrimination suit against BPD brought by Caucasian police officers, Plaintiff made certain observations and rendered advice that he avers was at odds with the opinions of his supervisors. Plaintiff took his concerns to Lt. Col. George Mitchell of BPD who, in turn, spoke to Defendant Thompson.  Plaintiff claims that, in retaliation for his raising issues related to her unit, Thompson began to spread false information about Plaintiff.  He claims she wrote a letter to Defendant Anderson falsely asserting that Plaintiff was unfamiliar with basic elements of discrimination law.  Plaintiff also alleges that Anderson stated that Plaintiff had told her staff to knowingly violate the law and that she believed that Plaintiff was

planning on "throwing" the pending suit against the BPD in order to support his criticisms of the EEO Unit.

On October 14, 2003, Defendants Zollicoffer and Huskey suspended Plaintiff for five days.  Plaintiff was told that his suspension was based upon "'complaints from the client'" that Plaintiff had acted in an "'abusive and unprofessional'" manner. Am. Compl. ¶ 27.  Plaintiff was also ordered to apologize to the client, both orally and in writing, for his offending behavior.

Plaintiff served the suspension but did not issue the apology.  On November 19, 2003, Defendant Anderson entered Plaintiff's office at about 10:00 a.m. and demanded that he produce the written apology.  Plaintiff indicated that he needed more information as to whom the apology should be addressed and the criteria by which it would be judged. Plaintiff also explained that he had retained an attorney.  By 4:30 that afternoon, Plaintiff had been fired by Defendants Zollicoffer and Huskey.

Within a month of his termination, Plaintiff filed charges with the EEOC.  After receiving his right to sue letter, Plaintiff filed this action on September 24, 2005. Plaintiff originally named only Defendant Thompson and BPD as defendants and the Complaint included just five counts.

Plaintiff subsequently filed an Amended Complaint that presents a hodgepodge of state tort claims, state constitutional claims, and federal claims under Title VII, 42 U.S.C. § 1983, and 42 U.S.C. § 1985 -- 24 counts in total.  In addition to the individuals Thompson, Anderson, Huskey, Zollicoffer, and Tyler, Plaintiff names BPD and the Mayor and City Council for the City of Baltimore, Maryland [the City] as defendants.   Defendants have moved to dismiss the Amended Complaint in its entirety.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In considering such a motion, the court is required to accept as true all well-pled allegations in the Complaint, and to construe the facts and reasonable inferences from those facts in the light most favorable to the plaintiff.  See Ibarra v. United States, 120 F.3d 472, 473 (4th Cir. 1997).  "To survive a motion to dismiss, Plaintiff[s] must have alleged facts that show that they are entitled to relief on their substantive causes of action."  In re Criimi Mae, Inc. Securities

<u>Litigation</u>, 94 F. Supp. 2d 652, 656 (D. Md. 2000).

**III. DISCUSSION**

Defendants raise no less than 16 different challenges to all or parts of the Amended Complaint.  Because Defendants' last challenge is potentially the broadest in scope, the Court will begin there.

<u>A. Preliminary Considerations</u>

<u>1. Implications of Attorney/Client Privilege</u>

Defendants argue that the entire Amended Complaint must be dismissed because it necessarily and improperly discloses privileged attorney-client communications.  Defendants' primary support for this argument comes from a trio of Illinois state court decisions holding that in-house attorneys are precluded from bringing wrongful discharge actions against their former employers: <u>Balla v. Gambro</u>, 584 N.E.2d 104 (Ill. 1991); <u>Ausman v. Arthur Anderson, LLP</u>, 810 N.E.2d 566 (Ill. App. 2004); and <u>Herbster v. North American Co. for Life & Health Ins.</u>, 501 N.E.2d 343 (Ill. App. 1986).  The Illinois courts base this preclusion on the "chilling effect on the communications between the employer/client and the in-house counsel" that would result were such suits allowed.  <u>Balla</u>, 584 N.E.2d at 109.  Defendants also find support in a few decisions from other state courts that restrict, without

6

completely barring, the ability of in-house counsel to assert
wrongful discharge claims.  <u>See</u>, <u>e.g.</u>, <u>General Dynamics v.
Superior Court</u>, 876 P.2d 487 (Cal. 1994) (en banc); <u>GTE Prods.
Corp v. Stewart</u>, 653 N.E.2d 161 (Mass. 1995).

One factor readily distinguishing the Illinois cases from
this Maryland case is the difference in the ethics codes that
govern attorney conduct in the respective states.  Rule 1.6 of
the Maryland Rules of Professional Conduct, which addresses
those situations in which confidential client information can
be revealed, specifically provides that a lawyer may reveal
that information "to the extent the lawyer reasonably believes
necessary . . . to establish a claim or defense on behalf of
the lawyer in a controversy between the lawyer and the client
. . . ."[3]  Md. Rule of Prof. Conduct 1.6.  Where attorney
conduct is governed by a rule that allows disclosure of client
secrets "to establish a claim or defense" against the former
client, courts have shown more willingness to allow claims
such as those presented here to go forward.  <u>See</u>, <u>e.g.</u>,
<u>Spratley v. State Farm Mut. Auto. Ins. Co.</u>, 78 P.3d 603 (Utah

---

[3] The language of the similar provision in the Illinois
Rules of Professional Conduct, Rule 1.6(c)(3) is more limited:
"A lawyer may use or reveal . . . (3) confidences or secrets
necessary to establish or collect the lawyer's fee or to
defend the lawyer or the lawyer's employees or associates
against an accusation of wrongful conduct."

2003); <u>Kachmar v. Sungard Data Systems, Inc.</u>, 109 F.3d 173 (3rd Cir. 1997).

In <u>Spratley</u>, two in-house attorneys for an insurance company claimed that they had to resign their employment because of pressure from the insurance company to engage in unlawful and unethical conduct.  They then sued their former employer, supporting their claims with confidential attorney-client communications.  In overturning the trial court's ruling that this confidential information could not be disclosed to support the plaintiffs' claim, the Utah Supreme Court focused on the portion of Utah Rule of Professional Conduct 1.6 which is identical to the Maryland Rule quoted above.  Citing ethics opinions from the American Bar Association and the Oregon State Bar, as well as other state court decisions interpreting Rule 1.6, the court concluded, "[d]espite the countervailing considerations outlined in the opinion of the court in <u>Balla</u>, the plain language of Rule 1.6 and the policy considerations outlined in other cases weigh in favor of allowing disclosure, in a limited fashion, of confidential client information in a suit by former in-house counsel for wrongful discharge."  78 P.3d at 609.  <u>See also</u> <u>Crews v. Buckman Labs. Int'l, Inc.</u>, 78 S.W.3d 852 (Tenn. 2002)( relying on "claim or defense" language of Tennessee's

8

Rule 1.6 and concluding that "the public interest is better served [when] in-house counsel's resolve to comply with ethical . . . duties is strengthened by providing judicial recourse when an employer's demands are in direct and unequivocal conflict with those duties").

In <u>Kachmar</u>, a former in-house attorney brought claims against her former employer including claims of sex discrimination and retaliatory discharge under Title VII. Raising arguments similar to those raised here, the employer sought to dismiss the claims on the ground that maintenance of the suit "would improperly implicate communications subject to the attorney-client privilege and/or information relating to [the plaintiff's] representation of [her former employer]." 109 F.3d at 179.   While the Third Circuit Court of Appeals found the "claim or defense" language in Rule 1.6 "inconclusive" on the issue of whether the plaintiff was permitted under the ethical rules to disclosure of those confidences necessary to support her claim, <u>id.</u> at 180, the court nonetheless concluded that dismissal of the plaintiff's claims was not appropriate in light of the "important public policies underlying federal antidiscrimination legislation and the supremacy of federal laws." <u>Id.</u> at 181.   The court noted that "there are other means to prevent unwarranted disclosure

of confidential information" short of dismissing the
plaintiff's claims.   Id.

Defendants' reliance on General Dynamics is unavailing
for similar reasons.  The California Supreme Court did hold,
as Defendants quote, "that where an in-house lawyer's claim
'cannot, for reasons peculiar to the particular case, be fully
established without breaching the attorney-client privilege,
the suit must be dismissed in the interest of preserving [the
privilege].'"  Defs.' Mot. at 44 (quoting General Dynamic, 876
P.2d at 503-504).[4]  The court allowed, however, that claims of
former in-house attorneys could go forward where "some statute
or ethical rule, such as the statutory exceptions to the
attorney-client privilege . . . specifically permits the
attorney to depart from the usual requirement of
confidentiality."  876 P.2d at 503.  Here, Rule 1.6(b)(3)
allows that departure.

While courts have concluded that a rule similar to
Maryland's Rule 1.6 allows former in-house counsel to go
forward with retaliation claims, such a rule does not
completely obliterate the former employer's right to maintain
its confidences.  The Spratley court cautioned that, in

_____

[4] Defendants erroneously end the quotation with "in the
interest of preserving justice."  The actual quotation ends
with "in the interest of preserving the privilege."

allowing claims of the type brought here, "both former in-house counsel and the trial courts must exercise great care in disclosing confidences. . . .  The professional judgment of the former in-house attorney and the stringent limitations available to trial courts are of paramount importance in restricting disclosures within the bounds of Rule 1.6." 78 P.3d at 609-610.  The Third Circuit in <u>Kachmar</u> instructed, "[i]n balancing the needed protection of sensitive information with the in-house counsel's right to maintain the suit, the district court may use a number of equitable measures at its disposal 'designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege [,including, t]he use of sealing and protective orders, limited admissibility of evidence, orders restricting the use of testimony in successive proceedings, and, where appropriate, in camera proceedings.'"  109 F.3d at 182 (<u>quoting</u> <u>General Dynamics</u>, 876 P.2d at 504).

The degree to which this Court must employ these means to continue to protect the confidences of Defendants is the subject of Defendants' motion to seal.  Defendants urge that the entire record be sealed because "[c]onfidential, privileged attorney-client communications permeate the

pleadings in this matter."  Reply in Support of Mot. To Seal
at 1.  Plaintiff responds that Defendants have waived any
privilege they might have had by placing the quality of
Plaintiff's representation "at issue" and by submitting
privileged communications to the EEOC.

In addition, Plaintiff argues that the attorney-client
privilege is significantly limited in the context of attorneys
representing governmental entities.  In the case of a
government attorney, he argues, the ultimate client is the
general public and the public's right to know about the
workings of the government body takes precedent over that
body's interest in protecting its secrets.

Aside from any considerations related to the strength or
preservation of the attorney-client privilege, Defendants'
motion to seal is clearly overbroad.  Many of Plaintiff's
allegations are tangentially related, at best, to any
confidential attorney-client conversations, e.g., Plaintiff's
claims about the frequent relocation of his office or
disproportionate case assignments.  There are no grounds for
exhibits or pleadings related to these matters to be sealed.

Other aspects of the Amended Complaint undeniably do
relate directly to legal advice that Plaintiff gave his former
employer.  Specifically, Plaintiff recounts the assessment

that he gave his employer concerning the deficiencies of BPD's EEO Unit, the potential liability exposure related to those deficiencies, and suggested remedies to cure those deficiencies.  See Am. Compl. at ¶¶ 17, 19 and Pl.'s Exhs. 3, 5, 20.  The Court notes that these references are very general in nature, however, and reveal only Plaintiff's opinions and advice and not any confidential information provided to him to aid in the formation of those opinions or the rendering of that advice.

To the extent that Plaintiff's advice to Defendants concerning the EEO Unit fell within the attorney-client privilege,[5] the Court concludes that the privilege has been waived.  Defendants produced to the EEOC the same documents it now faults Plaintiff for submitting to this Court.  The Court notes that Defendants produced these documents with no assertion of privilege nor provision to protect against waiver.

It is well settled that "[a]ny disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege."

---

[5] Because the Court finds that Defendants waived any privilege that might attach to this communication, it need not reach, at least at this time, Plaintiff's argument regarding a lessened protection for the attorney-client privilege in the governmental setting.

13

<u>United States v. Jones</u>, 696 F.2d 1069, 1072 (4th Cir. 1982).

And, at least where the disclosure is voluntary, the privilege

is waived "not only as to the specific communication

disclosed, but often as to all other communications relating

to the same subject matter."  <u>Id.</u>   Furthermore, the waiver

occurs even if the third party agrees to keep the documents

confidential, and even if the third party is a government

body.  <u>Labelle v. Philip Morris Inc.</u>, Civ. No. 2-98-3235-23,

2000 WL 33957169 at *4 (D.S.C. Oct. 23, 2000); <u>See also</u> <u>Naquin</u>

<u>v. Unocal Corp.</u>, Civil Action No. 01-3124, 2002 WL 1837838

(E.D. La. Aug 12, 2002) (holding that by "affirmatively

[choosing] to submit privileged communications to a third

party, the EEOC, in opposition to plaintiff's EEOC charge as

purported evidence" of a good faith reason for plaintiff's

termination, defendant waived the attorney-client privilege as

to all communications related to that subject matter).

In light of this waiver, the Court will deny Defendants'

motion to seal.  Everything in the record as it currently

stands that could arguably fall within the attorney-client

privilege also falls within the scope of the waiver, as it all

relates to Plaintiff's advice concerning the EEO Unit.

Plaintiff is cautioned, however, that he must continue to

exercise his professional judgment and the utmost care in

14

protecting any confidences of his former employer that might fall outside of the scope of the waiver.

### 2. Sufficiency of Service of Process

Defendants Thompson and BPD move to dismiss all claims against them on the ground that service of process was untimely. The complaint naming them as defendants was filed on September 24, 2005, and under Rule 4(m) of the Federal Rules of Civil Procedure, service was required to have been effected on or before Monday, January 24, 2005.[6] Service was not effected on Thompson, however, until January 25, 2005, and on BPD until January 27, 2005. Plaintiff explains that it was anticipated that his counsel's legal assistant would transmit the summons and complaint on Friday, January 21, 2005, via certified mail and private process. The legal assistant has submitted an affidavit explaining that she had a scheduled eye exam on that date and "due to consequences resulting from the exam," was unable to report to work. Affidavit of Robin Comotto ¶ 4. She further represents that she was unable to go to work on Monday, January 24, 2005, because she had to stay home with a sick child. Id. ¶ 6. By way of explanation as to why he waited until the 119th day to make the first effort at

---

[6] Because the 120th day fell on a Saturday, Plaintiff had until the next business day to effect service.

service, Plaintiff's counsel offers that Plaintiff was engaged in negotiations with a prominent D.C. law firm to handle his case, negotiations which ultimately did not materialize into an agreement of representation.

The Court notes that service of Thompson and BPD was about as straightforward as service could be.  Defendants' addresses were known and Defendants were fully available to be served.  Defendants add that their counsel even contacted Plaintiff's counsel by telephone and by letter well before the expiration of the 120 days and inquired about the status of service on the Defendants.  See Defs.' Exh. C, January 5, 2005, letter from Defs.' counsel to Pl.'s counsel.

Under Rule 4(m), "If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specific time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period." Precedent in the Fourth Circuit interprets Rule 4(m) as mandating a showing of "good cause" before an extension can be granted, see Mendez v. Elliot, 45 F.3d 75 (4th Cir. 1995),

16

although judges in this district, including the undersigned, have questioned the continuing vitality of the <u>Mendez</u> decision.  <u>See</u> <u>Hammad v. Tate Access Floors, Inc.</u>, 31 F. Supp. 2d 524, 526 (D. Md. 1999)(Blake, J.); <u>Melton v. Tyco Valves & Control, Inc.</u>, 211 F.R.D. 288 (D. Md. 2002)(Nickerson, J.).

If <u>Mendez</u> is still good law, no argument can be made that Plaintiff has shown "good cause" for his failure to timely serve these defendants.  Courts have found that efforts at timely service that were frustrated by far more serious obstacles did not meet that standard.  <u>See</u>, <u>e.g.</u>, <u>Braithwaite v. Johns Hopkins Hosp.</u>, 160 F.R.D. 75 (D. Md. 1995) (concluding murder of plaintiff's daughter and negligence of plaintiff's attorney were not good cause for failure to serve within 120 days).  Typically, for a court to find good cause, some extraordinary circumstance must have impeded service, for example: the defendant was evading service (<u>Ruiz Varela v. Sanchez Velez</u>, 814 F.2d 821 (1st Cir. 1987)); the plaintiff experienced difficulty in obtaining defendant's proper address (<u>Bright v. Harrison</u>, Civ. No. 87-899,  1988 WL 50328 (E.D. Pa. May 18, 1988)); the plaintiff was misdirected by court personnel as to proper procedure (<u>Patterson v. Brady</u>, 131 F.R.D. 679, 684-85 (S.D. Ind. 1990) (finding good cause where the fault for failure to serve rested "squarely on the Clerk's

office")); or a defect in the attempted service was not revealed by the defendant until after the time expired (<u>Guess?, Inc. v. Chang</u>, 912 F. Supp. 372 (D.C. Ill. 1995)). The unforeseen circumstances that impeded Plaintiff's counsel's legal assistance relate to just two of the available 120 days. "Last minute attempts at service, absent some explanatory justification, do not establish good cause." <u>McIsaac v. Ford</u>, 193 F. Supp. 2d 382, 383-384 (D. Mass. 2002); <u>see also</u>, <u>Sullivan v. Mitchell</u>, 151 F.R.D. 331, 333 (N.D. Ill. 1993) (no good cause shown where "[p]laintiff gave no thought to personal service until a few days before the expiration of the 120 day period . . . . [and] failed to move for a Rule 6(b) extension of time to enlarge the period for service either prior or subsequent to the 120 day period."). Furthermore, no explanation is given as to why someone else did not attend to these duties in the legal assistant's absence.

Were the Court to assume that <u>Mendez</u> is no longer good law and that a finding of good cause is not required, the Court would still need to have some reasoned basis to exercise its discretion and excuse the untimely service: the Court must give some import to the rule. If the rule is ignored in this instance where Plaintiff's counsel did absolutely nothing to

attempt to serve these defendants for 118 days, and offers the
unavailability of one of his office staff on the final two
days as the reason for untimely service, it becomes difficult
to imagine what scenario would not give rise to a free pass
around the rule.

Accordingly, the Court finds that the claims against
Thompson and BPD must be dismissed, without prejudice.  As
Plaintiff's defamation claim (Count IV) and interference with
economic relations claim (Count V) are only brought against
Defendant Thompson, the Court need not address Defendants'
additional arguments related to those claims at this time.[7]

B. State Law Claims

1.  Compliance with Local Government Tort Claims Act

Defendants assert in their motion to dismiss that
Plaintiff failed to comply with the Maryland Local Government
Tort Claims Act, Md. Code Ann., Cts & Jud. Proc. § 5-304
[LGTCA], prior to filing this action.  Under the LGTCA, notice
of the claim must be given within 180 days after the injury.

------------------------

[7] While a dismissal under Rule 4(m) is without prejudice,
the parties make brief reference to the possibility that some
of Plaintiff's claims may be barred by applicable statutes of
limitations.  The Court renders no opinion as to whether
refiled claims will be time barred but notes that the
possibility that refiled claims might be barred does not
prohibit the Court from enforcing the rule.  United States v.
Britt, 170 F.R.D. 8, 10 (D. Md. 1996).

In Baltimore City, notice must be made in person or by certified mail to the corporate authorities for the City or to the City Solicitor, id. § 5-304(b)(1), and must state the time, place, and cause of the injury.  Id. § 5-304(b)(3).

With his opposition, Plaintiff attaches the notice that he sent to Defendant Zollicoffer, by certified mail, on December 18, 2003.  Upon a review of the notice, the Court finds it to be in full compliance with the requirements of the LGTCA.

2. Due Process Rights Under Article 24

Plaintiff brings five claims under Article 24 of the Maryland Declaration of Rights, Counts III, VII, XV, XVII, and XIX.  Defendants contend that none of these counts state a cause of action.

Article 24 offers due process protections similar to those found in the Fourteenth Amendment to the United States Constitution and courts have held that the provisions of Article 24 and the Fourteenth Amendment are construed as parallel with each other.  Robles v. Prince George's County, 302 F.3d 262, 272 (4th Cir. 2002).  "[I]n order to claim entitlement to the protections of the due process clause . . . a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has

20

been 'deprived' of that protected interest by some form of 'state action.'"  <u>Stone v. Univ. of Md. Medical Sys. Corp.</u>, 855 F.2d 167, 172 (4th Cir. 1988).  As an at-will employee, Plaintiff can claim no protected "property" interest.  <u>Pittman v. Wilson County</u>, 839 F.2d 225, 229 (4th Cir. 1988).[8]  Instead, Plaintiff asserts that he has been deprived of a "liberty" interest.

The typical claim for a deprivation of a protected liberty interest in the employment context arises when the plaintiff alleges that his former employers made statements concerning the plaintiff that harmed his reputation.  In order to state such a claim a plaintiff "would have to allege facts tending to show that his superiors made charges against him that might seriously damage his standing and associations in his community or otherwise imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities; that those charges were made 'public' by his employer; and that the charges were false. <u>Stone</u>, 855 F.2d at 173 n.5 (citations omitted).  Because Plaintiff has not alleged that Defendants made any public

---

[8] Plaintiff makes no affirmative claim to a protected property right.  While he does obliquely allude to the possibility that, as one jointly employed by BPD, he "may indeed have civil service protections," Opp. at 14, he does not support that assertion in any way.

charge against him, he has not stated this type of "liberty interest" due process claim.

While less common, courts have also found an employee's liberty interests implicated where there has been a "termination of employment in retribution for the exercise of First Amendment rights." Samuels v. Tschechtelin, 763 A.2d 209, 234 (Md. App. 2000).  It is this type of liberty interest claim that Plaintiff appears to be asserting in each of these five counts.  In Count III, Plaintiff alleges he was suspended and then terminated for "speech . . . [that] was protected expression regarding a matter of public concern."  Am. Compl. ¶ 48.[9]  In Count VII, Plaintiff alleges that Defendants' requirement that he apologize "violated [his] First Amendment rights to not speak."  Id. ¶ 56.  Count XV asserts another "free speech" claim, alleging "[Plaintiff's] speech . . . in which he complained that the action taken toward him were in retaliation of his exercising his First Amendment rights . . . were protected expressions regarding matters of public

---

[9] Each of Plaintiff's Article 24 claims immediately follows a similar claim brought under 42 U.S.C. § 1983.  For example, in Count III, Plaintiff states "that the actions complained of in Count II (a § 1983 claim) also violated the Plaintiff's State Due Process rights under Maryland's Declaration of Rights, Art. 24."  Thus, the paragraphs quoted here and immediately infra are actually taken from the parallel § 1983 counts.

concern." Id. ¶ 73.  Counts XVII and XIX assert "right to
petition" and "right to free association," claims,
respectively.  Id. ¶¶ 77, 81.

As the Court concludes for the reasons explained below,
see Section III(c)(4), infra, that Plaintiff's speech and
conduct are not protected speech or conduct within the
framework of First Amendment jurisprudence, the Court must
also conclude that there are no liberty interests to be
protected under Article 24.  Counts III, VII, XV, XVII, and
XIX will be dismissed.

### 3. Wrongful Discharge

The Amended Complaint includes a wrongful discharge claim
against Defendants the City, Zollicoffer, Huskey, and
Anderson.  For an at-will employee (such as Plaintiff) to
state a claim for wrongful discharge, he must allege that his
discharge was "in violation of a clear mandate of public
policy which otherwise would not be vindicated by a civil
remedy." Makovi v. Sherwin-Williams, Co., 561 A.2d 179, 185
(Md. 1989).  Plaintiff alleges that the public policy violated
in this instance is that embodied in the Maryland Public
Information Act, Md. Code Ann., State Gov't § 10-614 et seq.
[MPIA].  Plaintiff avers that after his November 19, 2003,
declaration, both personally and through counsel, of his

intent to obtain the "complaint letters" against him through
an MPIA request, he was immediately terminated.  The Court
finds that, while Plaintiff's wrongful discharge claim is
tenuous at best and is seemingly inconsistent with Plaintiff's
other claims,[10] it will survive the motion to dismiss.

The Maryland Court of Appeals has acknowledged that the
MPIA "establishes a public policy and a general presumption in
favor of disclosure of government or public documents."
Kirwan v. The Diamondback, 721 A.2d 196, 199 (Md. 1998).  The
statute provides generally that "[a]ll persons are entitled to
have access to information about the affairs of government and
the official acts of public officials and employees," Md. Code
Ann., State Gov't § 10-612(a), and that, to carry out this
right, the MPIA's provisions should be "construed in favor of
permitting inspection of a public record, with the least cost
and least delay to the person or governmental unit that
requests the inspection."  Id. § 10-612(b).  This is a
sufficiently clear mandate of public policy to support a
wrongful discharge claim.  See Porterfield v. Mascari II,
Inc., 823 A.2d 590, 602 (Md. 2003) (noting that "a public

---

[10] The gist of the Amended Complaint is that certain
defendants were determined to see him fired because he had
criticized BPD's EEO Unit.  This determination to see
Plaintiff fired was allegedly formed long before Plaintiff
stated any intent to obtain records through the MPIA.

policy mandate providing a basis for a wrongful discharge claim ordinarily should be derived from constitutional or statutory expressions of public policy"); Sears, Roebuck and Co. v. Wholey, 779 A.2d 408, 412 (Md. App. 2001) (observing that legislative enactments are one of the "chief sources of public policy").

The Court also finds that a violation of this policy such as alleged here would be otherwise unvindicated.  While the MPIA provides to a person who has been wrongfully denied access to public records remedies which include: injunctive relief, orders to compel production, and the award of damages caused by the delay in disclosing record sought, Md. Code Ann., State Gov't § 10-623, there is no remedy for someone who has been terminated for attempting to exercise his rights under the MPIA.  Cf. Allen v. Bethlehem Steel Corp., 547 A.2d 1105 (Md. App.) (finding wrongful discharge claim was stated where it was alleged that employee was terminated for filing worker's compensation claim).

Defendants contend that the Amended Complaint fails to state a wrongful discharge claim because Plaintiff nowhere states that he actually exercised his rights under the MPIA prior to his termination, he merely indicated that at some future time that he would be seeking the complaint letters

25

under the MPIA.  Mot. at 15.  Defendants observe that he did
not make formal application for the documents until December
10, 2003, well after he was terminated.  Reply at 8.  Thus,
according to Defendants, Plaintiff has not demonstrated a
sufficient nexus between the MPIA and his termination.

The Court finds that if an employee is fired for stating
a present intent to seek public records under the MPIA, the
public policy behind the MPIA is no less violated than if the
employee is fired after actually filing the formal application
for the public records.  To hold otherwise would create an
incentive for employers to preemptively discharge an employee
once it learned of his intent to exercise MPIA rights.  In so
finding, the Court is aware that language in the Maryland
Court of Appeals decision in Porterfield would appear to
support Defendants' position where it states "[t]he
possibility that an assumed right may be exercised is not the
same as the actual act of exercising that right."  823 A.2d at
606.

In Porterfield, the plaintiff was fired after "she
informed her supervisors . . . that she had been advised to
consult an attorney before 'formally responding' to a[n
unfavorable work evaluation]."  Id. at 593.  The public policy
on which she sought to hang her wrongful discharge claim was

26

the purported mandate "that all persons be permitted freely to consult with an attorney of their choice concerning matters of importance in their lives, including matters related to their employment."   Id. at 605.   This Court notes the difference in the relative immediacy of the proposed exercise of the right in Porterfield and in the case at bar.   Compare Porterfield, 823 A.2d at 606 (characterizing the plaintiff's claim as conflating "any public policy generally favoring access to counsel with a policy that is violated by the mere suggestion by an employee that he or she may want to seek advice of counsel") (emphasis added) with Pl.'s Exh 9 (request of Plaintiff, through counsel and "pursuant to [the MPIA]," that Zollicoffer forward the requested records).   More significantly, the decision in Porterfield turned not on the imminence of the exercise of the asserted right but on the conclusion "that Maryland law does not recognize with sufficient particularity the general right characterized by [the plaintiff] in her amended complaint."   823 A.2d at 606.

While allowing this claim to go forward against the individual defendants, the Court notes that the City is entitled to governmental immunity as to this claim. Defendants argue, and Plaintiff does not dispute, that the City has governmental immunity from direct tort liability

27

arising from the exercise of governmental functions, such as personnel actions.  See Tadjer v. Montgomery County, 479 A.2d 1321 (Md. 1984); Austin v. City of Baltimore, 405 A.2d 255, 256 (Md. 1979).  The LGTCA does not waive this immunity.  See Williams v. Prince George's County, 157 F. Supp. 2d 596, 603-04 (D. Md. 2001).  The wrongful discharge claim against the City will be dismissed.

C. Federal Claims

1. Individual Supervisor Liability Under Title VII

Notwithstanding the fact that is now well established in this circuit that "supervisors are not liable in their individual capacities for Title VII violations," Lissau v. Southern Food Service, Inc., 159 F.3d 177, 181 (4th Cir. 1998), Plaintiff has brought several Title VII claims against several individuals.  Plaintiff contends that Lissau is applicable in the context of private but not public employment.  Opp. at 24-25.  Plaintiff provides no authority for this distinction and it is wholly inconsistent with the rationale of Lissau. Looking to the language in Title VII that exempts from its provisions companies with fewer than 15 employees, the Fourth Circuit noted it would be "incongruous" to hold individual supervisors liable under the statute.  159 F.3d at 181.  This Court has consistently applied Lissau in dismissing claims

28

brought against individual supervisors in the public employment context.  See, e.g., Luy v. Baltimore Police Dep't, 326 F. Supp. 2d 682, 688 (D. Md. 2004) (dismissing Title VII claim against police commissioner), aff'd, 120 Fed. Appx. 465 (4th Cir. 2005); Erskine v. Board of Educ., 197 F. Supp. 2d 399, 405 (D. Md. 2002) (dismissing Title VII claims against public school administrators).

The Title VII claims against Defendants Thompson, Huskey, and Tyler will be dismissed.

### 2. Racial Harassment / Hostile Environment Claims

In Counts VIII and IX of the Amended Complaint, Plaintiff asserts that he was subjected to an actionable hostile work environment because of his race.[11]  Defendants have moved to dismiss these counts on the grounds that Plaintiff has failed to plead facts that demonstrate a hostile environment based on race or that Defendants' conduct constituted severe and pervasive harassment.  The Court agrees.

To state a hostile work environment claim under Title VII or § 1983, a plaintiff must allege that: "(1) the harassment was unwelcomed; (2) the harassment was based on his race . . . ; (3) the harassment was sufficiently severe or pervasive to

---

[11] Count VIII is brought pursuant to Title VII, Count IX pursuant to 42 U.S.C. § 1983.

alter the conditions of employment and create an abusive
atmosphere; and (4) there is some basis for imposing liability
on the employer." <u>Causey v. Balog</u>, 162 F.3d 795 (4th Cir.
1998).  Aside from noting that he is Caucasian and the
Defendants are African-American, and generally averring that
he was "subjected to disparate discipline based on race," Am.
Compl. ¶ 41, Plaintiff offers no facts to connect the alleged
hostile treatment to race.  He cites no racially offensive
conduct or language.

Were the Court to assume that identifying the race of the
defendants and making conclusory statement as to their motives
is sufficient to state a claim, Plaintiff's claims nonetheless
fall woefully short of meeting the "severe or pervasive"
standard.  To be actionable, "[t]he conduct must be severe or
pervasive enough to create an environment that a reasonable
person would find hostile or abusive, and the victim must
subjectively regard that environment as abusive." <u>Conner v.
Schrader-Bridgeport Intern., Inc.</u>, 227 F.3d 179, 192 (4th Cir.
2000).  In making that determination, courts must examine the
totality of the circumstances, considering "(1) the frequency
of the discriminatory conduct; (2) its severity; (3) whether
it is physically threatening or humiliating, or a mere
offensive utterance; (4) whether the conduct unreasonably

interfered with the plaintiff's work performance; and (5) what psychological harm, if any, resulted." Wang v. Metropolitan Life Ins. Co., 334 F. Supp. 2d 853, 864 (D. Md. 2004). "The standard for proving an abusive work environment is intended to be a very high one because the standard is designed to filter out complaints attacking the ordinary tribulations of the workplace." Id. (internal quotations and footnote omitted).

Here, Plaintiff alleges that he was forced to relocate his office numerous times without justification, his work was subjected to "intense scrutiny," he was given an increased case load and forced to work longer uncompensated hours, and his job title was downgraded. Am. Compl. ¶ 14. This Court has found allegations similar to those raised here to fall short of stating a hostile environment. For example, the plaintiff in Wang, an insurance saleperson, alleged that her office administrator delayed the processing of her insurance license, delayed the transfer of customer accounts and created other problems that made it more difficult for her to sell financial products. This Court found that "this type of 'sporadic' inconvenience is not sufficiently 'severe or pervasive' to meet the demanding test to establish a hostile environment claim." Id. Similarly, Plaintiff has not alleged

31

facts to support a finding of the kind of racially-charged, offensive environment that courts have found actionable.

Relying on the Supreme Court's decision in <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508 (2002), Plaintiff contends that he need not plead specific facts in support of each element of his hostile environment claim.  In <u>Swierkiewicz</u>, the Supreme Court did hold in the context of a disparate treatment case that "an employment discrimination plaintiff need not plead a prima facie case of discrimination."  534 U.S. at 515.  Since the <u>Swierkiewicz</u> decision, however, the Fourth Circuit has interpreted <u>Swierkiewicz</u> so as to limit its sweep.  In the context of a hostile environment claim, the Fourth Circuit  observed,

> [o]ur circuit has not, however, interpreted <u>Swierkiewicz</u> as removing the burden of a plaintiff to allege facts sufficient to state all the elements of her claim.  <u>See Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 213 (4th Cir. 2002) ("[T]he Supreme Court's holding in <u>Swierkiewicz v. Sorema</u> did not alter the basic pleading requirement that a plaintiff set forth facts sufficient to allege each element of his claim." (internal citation omitted)); <u>Iodice [v. United States</u>,] 289 F.3d [270] 281 [(4th Cir. 2002)]. . . .  While a plaintiff is not charged with pleading facts sufficient to prove her case, as an evidentiary matter, in her complaint, a plaintiff <u>is</u> required to allege facts that support a claim for relief.  The words "hostile work environment" are not talismanic, for they

32

> are but a legal conclusion; it is the
> alleged facts supporting those words,
> construed liberally, which are the proper
> focus at the motion to dismiss stage.

Bass v. E.I. Dupont deNemours & Co., 324 F.3d 761, 765 (4th

Cir.), cert. denied, 540 U.S. 940 (2003).[12]  The court then

went on to affirm the district court's grant of a motion to

dismiss the plaintiff's hostile environment claim, concluding,

> Even viewed in the light most favorable to
> Bass, the facts she alleges merely tell a
> story of a workplace dispute regarding her
> reassignment and some perhaps callous
> behavior by her superiors.  They do not
> describe the type of severe or pervasive
> gender, race, or age based activity
> necessary to state a hostile work
> environment claim.  Bass was required to
> plead facts in support of her claim, and
> she had failed in that regard.

Id.

Counts VIII and IX will be dismissed.

### 3. "Disparate Investigation" Claims

In Counts XII and XXIII, Plaintiff attempts to assert

claims of "disparate investigation."  The gist of these claims

is that Plaintiff's performance and conduct was investigated

"in a manner different than [the manner] in which they

---

[12] District courts in this circuit have noted the "evident
tension between Bass and Swierkiewicz."  See, e.g., Cockerham
ex rel. Cockerham v. Stokes County Bd. of Educ., 302 F. Supp.
2d 490, 496 (M.D.N.C. 2004).  This Court, however, is bound to
follow the Fourth Circuit's interpretation of Swierkiewicz.

investigated African-American [attorneys' performance and conduct]."  Am. Compl. ¶ 90.  Defendants move to dismiss these claims on the ground that being investigated does not rise to the level of an actionable "adverse employment action."

It is well settled that to state a cause of action for disparate treatment under Title VII or § 1983, the plaintiff must allege that he suffered an "adverse employment action." Skipper v. Giant Foods, Inc., 187 F. Supp. 2d 493 (D. Md. 2002), aff'd, 68 Fed. Appx. 393 (4th Cir.), cert. denied, 540 U.S. 1074 (2003).  While an adverse employment action need not be an "ultimate employment decision" such as termination, the action taken must adversely affect "the terms, conditions, or benefits of employment."  Von Guten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001).  The few courts that have considered whether an investigation, by itself, can constitute an adverse employment action have answered that question in the negative. See, e.g., Benningfield v. City of Houston, 157 F.3d 369, 376 (5th Cir. 1998) (holding that "[a]lthough a reprimand can constitute an adverse employment action, an investigation does not").

Plaintiff's response to Defendants' motion highlights why these claims should be dismissed.  In attempting to distinguish Benningfield, he argues, "this is not an instance

where the Plaintiff was simply investigated . . . Plaintiff
here was terminated as a result of this racially based and
result oriented investigation." Opp. at 30.  Plaintiff,
however, has brought separate claims of disparate treatment
related to his termination.  <u>See</u> Counts XI and XXII.   For
Defendants' investigation of Plaintiff to give rise to an
independent claim, Plaintiff would need to allege some
employment injury caused by the investigation <u>independent of
his termination</u>.  <u>See</u> <u>Settle v. Baltimore County</u>, 34 F. Supp.
2d 969, 992 (D. Md. 1999) (observing that in order to state
claim for disparate investigation independent of disparate
discipline claim, "the nature and character of the
investigation" must have "actually adversely affected some
term or condition of employment"), <u>aff'd</u>, 203 F.3d 820 (4th
Cir. 2000).  This, Plaintiff has not done.

Counts XII and XXIII will be dismissed.

4<u>. First Amendment Claims</u>

As stated above, Plaintiff has alleged a multitude of
First Amendment violations related to his discipline and
termination.  In Count II, Plaintiff alleges that Zollicoffer,
Huskey, Anderson, and Thompson violated his right to free
speech by retaliating against him on account of "his speech
involving the EEO Unit's deficient performance and substandard

EEO investigations." Am. Compl. ¶ 48.  In Count XIV,
Plaintiff asserts what he calls a "second level retaliation"
free speech claim, i.e., he claims that his speech protesting
those actions taken against him in retaliation for his prior
protected speech is itself protected speech.  This claim is
against Defendants Zollicoffer and Huskey only.  Plaintiff's
third free speech claim in Count VI is more in the nature of a
"freedom not to speak" claim.  He alleges that forcing him to
apologize to members of the EEO Unit for criticizing the
performance of the unit violated his First Amendment rights.

Plaintiff brings two additional claims under other
clauses of the First Amendment.  In Count XVI, Plaintiff
asserts that by engaging in second level retaliation,
Zollicoffer and Huskey also infringed upon his right to
petition the government for redress of grievances.  In Count
XVIII, also brought against Zollicoffer and Huskey, Plaintiff
alleges that these Defendants violated his First Amendment
"right to free association" when they fired him for retaining
an attorney.

It is well established that, while "citizens do not
relinquish all of their First Amendment rights by virtue of
accepting public employment[,] . . . the state, as an
employer, undoubtedly possessed greater authority to restrict

36

the speech of its employees than it has as a sovereign to restrict the speech of the citizenry as a whole." <u>Urofsky v. Gilmore</u>, 216 F.3d 401 (4th Cir. 2000) (citations omitted), <u>cert. denied</u>, 531 U.S. 1070 (2001).  The determination as to whether a restriction placed on a public employee's speech violates the First Amendment requires "a balance between the interests of the [employee], as a citizen, in commenting upon matter of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Connick v. Myers</u>, 461 U.S. 138, 142 (1983).  This balancing requires two steps. First, the court must determine whether the speech at issue was that of a public concern. <u>Urofsky</u>, 216 F.3d at 406. Second, and only if the court finds the speech relates to a matter of public concern, the court must "consider whether the employee's interest in the First Amendment expression outweighs the public employer's interest in what the employer has determined to be the appropriate operation of the workplace." <u>Id.</u>

Plaintiff's other First Amendment claims also hinge on the distinction between matters of public concern and those merely of personal interest.  The Fourth Circuit recently joined the majority of other federal circuits in holding that

37

"a public employee's petition, like his speech, is
constitutionally protected only when it addresses a matter of
public concern." Kirby v. City of Elizabeth City, 388 F.3d
440, (4th Cir. 2004).  Similarly, while no Fourth Circuit
decision has directly addressed the issue, other courts have
held that "before an employee can claim that the First
Amendment prohibited his or her firing for associating with
counsel in order to pursue a lawsuit, the employee must show
that the subject of the lawsuit was a matter of public
concern." Milazzo v. O'Connell, 925 F. Supp. 1331, 1345 (N.D.
Ill. 1996) (citing Zorzi v. County of Putnam, 30 F.3d 885, 896
(7th Cir. 1994)).[13]

---

[13] Plaintiff argues that he can state a right of
association claim based upon the alleged retaliation for
retaining an attorney "[r]egardless of whether the matter was
a private or public concern." Opp. at 41.  In support of his
position, Plaintiff relies primarily on a decision issued
earlier this year by the Seventh Circuit, Carreon v. Illinois
Dep't of Human Services., 395 F.3d 786 (7th Cir. 2005).  One of
the claims in Carreon was that of an employee at a state
mental health facility who was suspended for insisting that
his attorney be present during an internal investigation
interview.  The court did opine in dicta that "[t]here is
authority for the proposition that a government employee's
right to associate with his lawyer extends to matters of
private concern." 395 F.3d at 796.  The court went on,
however, and affirmed the entry of summary judgment against
the employee on the ground that, because the interview was a
non-public forum, defendant could exclude the attorney on any
viewpoint-neutral basis reasonably related to the purpose
served by the forum.  Id. at 797.

Given the reasoning and holding in Kirby, this court is

The Fourth Circuit explained what is and what is not relevant to the determination as to whether speech involves a matter of public concern:

> [A court must] examine the content, context, and form of the speech at issue in light of the entire record.  Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community.  An inquiry into whether a matter is of public concern does not involve a determination of how interesting or important the subject of an employee's speech is.  Further, the place where the speech occurs is irrelevant:  An employee may speak as a citizen on a matter of public concern at the workplace, and may speak as an employee away from the workplace.

Urofsky, 216 F.3d at 406-07.

The Fourth Circuit in Urofsky went on to underscore the critical significance of the role in which the employee is speaking.

─────────────────

doubtful that the Fourth Circuit would adopt the dicta in Carreon.  It seems inconsistent to hold that consultation with an attorney for the purpose of filing an action against a public employer is protected under the First Amendment where the actual filing of the action is not.  This Court further notes that Carreon was decided after the relevant conduct in this action.  At the time of the alleged conduct at issue in this count, the scope of the First Amendment protection is sufficiently uncertain in this context so as to entitle Defendants to qualified immunity.  See Kirby, 388 F.3d at 450-51 (holding that where the "legal viability of the claim presents a close and novel issue," defendants "cannot be held liable for what would amount to 'bad guesses in a gray area'").

[I]n its decisions determining speech to be entitled to First Amendment protection the [Supreme] Court has emphasized the unrelatedness of the speech at issue to the speaker's employment duties.  See [United States v. National Treasury Employees Union], 513 U.S. [454,] 465 [(1995)] (concluding that balancing test applied to employees' "expressive activities in their capacity as citizens, not as Government employees" and noting that "[w]ith few exceptions, the content of [employees'] messages [had] nothing to do with their jobs"); id. at 466 (emphasizing that the Court has applied the Pickering[14] balancing test "only when the employee spoke as a citizen upon matters of public concern rather than as an employee upon matters only of personal interest"); id. at 480 (O'Connor, J., concurring in the judgment in part and dissenting in part) (agreeing that balancing test was appropriate because restriction applied only to "off-hour speech bearing no nexus to Government employment"); Pickering, 391 U.S. at 574 (explaining that when "the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by [the employee], . . . it is necessary to regard the [employee] as the member of the general public he seeks to be").  Thus, critical to a determination of whether employee speech is entitled to First Amendment protection is whether the speech is "made primarily in the [employee's] role as citizen or primarily in his role as employee.  Terrell [v. Univ. of Texas Sys. Police], 792 F.2d [1360,] 1362 [(5th Cir. 1986)]; see Boring [v. Buncombe County Bd. of Educ.], 136 F.3d [364,] 368-69 [(4th Cir. 1998)] (holding that the selection of a

---

[14] Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

play by a high school drama teacher did not
involve a matter of public concern because
the choice was made by the teacher in her
capacity as a teacher in a matter dealing
with curriculum); <u>Holland [v. Rimmer</u>], 25
F.3d [1251,] 1255-56 [(4th Cir. 1994)
(concluding that speech by supervisor
disciplining subordinates was not speech as
private citizen on matters of public
concern because it constituted "in-house
communications between employees <u>speaking
as employees</u>"); <u>see also</u> <u>DiMeglio [v.
Haines]</u>, 45 F.3d [790,] 805 [(4th Cir.
1995)](noting that "the [Supreme] Court
[has] distinguished between speaking as a
citizen and as an employee, and [has]
focused on speech as a citizen as that for
which constitutional protection is afforded").

This focus on the capacity of the
speaker recognizes the basic truth that
speech by public employees undertaken in
the course of their job duties will
frequently involve matters of vital concern
to the public, without giving those
employees a First Amendment right to
dictate to the state how they will do their
jobs.

216 F.3d at 407.

Here, the Court can only conclude that the speech and

conduct at issue related primarily to Plaintiffs' role as an

employee and thus, were not protected.  Plaintiff's criticisms

about the EEO Unit were directly related to cases to which he

was assigned as an employment attorney for BPD.  His comments

were addressed exclusively to individuals within BPD and the

City Law Department.  While Plaintiff can claim that "his

speech was motivated in part due to his concern as a taxpaying member of the public, concerned with unnecessary public liability," Opp. at 33, any public employee could raise a similar argument about any workplace issue.

It is even more clear that Plaintiff's "second level" claims do not involve protected speech or conduct.  Grievances up the chain of command about workplace discipline imposed by immediate supervisors, or disagreements about whether an employee must apologize to a client for the manner in which he allegedly conducted himself are quintessentially matters of personal interest and not of public concern.  "[I]t is settled that a public employee's expression of grievances concerning his own employment is not a matter of public concern."  Huang v. Bd. of Governors of Univ. of North Carolina, 902 F.2d 1134, 1140 (4th Cir. 1990).

Plaintiff's First Amendment claims, Counts II, VI, XIV, XVI, and XVIII will be dismissed.

5. Conspiracy Claims Under Section 1985

In Count XX, Plaintiff avers generally that Defendants Zollicoffer, Huskey, Anderson, and Thompson "conspired to deprive the Plaintiff of his Federally protected claims [sic] as set forth in this Complaint."  Am. Compl. ¶ 84.  To prove a conspiracy under § 1985, a plaintiff must establish (1) a

conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. <u>Simmons v. Poe</u>, 47 F.3d 1370, 1376 (4th Cir. 1995).  Furthermore, to prove a section 1985 conspiracy, the plaintiff must "show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." <u>Id.</u>  The Fourth Circuit has taken a restrictive view of this cause of action, noting that, "under that standard, [it] has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion.  Indeed, we have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." <u>Id.</u>  Defendants have moved to dismiss this count on the grounds the Plaintiff has not alleged an "agreement" or "meeting of the minds" by Defendants to violate his constitutional rights.[15]

---

[15] In the alternative, Defendants argue Plaintiff's conspiracy claim fails under the "intracorporate conspiracy doctrine" in that all of the Defendants are agents of the same

As an initial matter, the Court notes that as it has found that Plaintiff has not stated claims under the First Amendment, those claims cannot underlie Plaintiff's conspiracy claim.  As to Plaintiff's claims that Defendants conspired to deprive him of other constitutional rights, the Court concurs with Defendants that there is insufficient allegation of agreement.  Plaintiff alleges that several defendants joined in harassing Plaintiff, Am. Compl. ¶ 14, but that is not the

---

entity.  Although the Fourth Circuit has upheld the application of the doctrine in the civil rights context, see Buschi v. Kirven, 775 F.2d 1240 (4th Cir. 1985), Plaintiff is correct that the issue is somewhat unsettled.  See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775 n.24 (1984) (noting, without addressing, a split in authority on whether the doctrine should apply in this context). Regardless, had Plaintiff otherwise stated a claim for conspiracy the Court would conclude that Plaintiff has sufficiently pled that at least some of the Defendants, most notably Defendant Thompson, were motivated by personal animus and thus Plaintiff's claim would fall under an exception to the intracorporate conspiracy doctrine.  Compare Am. Compl. ¶ 24 ("Defendant Thompson . . . motivated by actual malice and hate. . .") with Buschi v. Kirven, 775 F.2d 1240, 1252 (4th Cir. 1985) (observing that an exception to the intracorporate conspiracy doctrine may be justified "when the officer has an independent personal stake in achieving the corporation's illegal objective").

same as an actual agreement to violate his rights.  See,
Hejirika v. Maryland Div. of Correction , 264 F. Supp. 2d 341,
347 (D. Md. 2003)(dismissing § 1985 claim where "plaintiffs
merely allege various instances of discrimination and then, in
a conclusory fashion, state a conspiracy claim").  The Court
notes that even in the Opposition, Plaintiff avoids stating
that Defendants entered an agreement, instead, Plaintiff
merely repeats that they "acted" together.  Opp. at 31.

Count XX will be dismissed.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motion to seal
will be denied and Defendants' motion to dismiss will be
granted in part and denied in part.  Claims against Defendants
Thompson and BPD will be dismissed without prejudice.  The
"Abusive Discharge" claim in Count XIII will be dismissed as
against the City.  The Title VII claims brought against any
individual defendant will be dismissed.  In addition, the
following counts against other Defendants will be dismissed:
Counts II, III, VI, VII, VIII, IX, XII, XIV, XV, XVI, XVII,
XVIII, XIX, XX, and XXIII.

A separate order consistent with this memorandum will
issue.

 

 

 

_____/s/_____
William M. Nickerson
Senior United States District Judge

Dated: June 29, 2005